IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CURTIS HILLARD, JR.                                                                              PLAINTIFF

V.                        Civil No. 2:24-cv-02151-TLB-MEF

FRANK BISIGNANO, Commissioner,[1]
Social Security Administration                                                                   DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Curtis Hillard, Jr., brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying his claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

## I.     Procedural Background

Plaintiff filed his application for DIB on May 24, 2021, alleging disability since March 1, 2020, due to back, leg, and memory problems. (ECF No. 8, pp. 72, 81, 199-201, 226). An administrative hearing was held on September 21, 2023. (*Id.* at 48-70). The Plaintiff was both present and represented by counsel, Michael Hamby.

---

[1] Frank Bisignano was sworn in to serve as Commissioner of the Social Security Administration on May 7, 2025, and in his official capacity is substituted as defendant. *See* Fed. R. Civ. P. 25(d).

1

Born on March 19, 1973, Plaintiff was 46 years old on his alleged onset date and possessed a high school education. (ECF No. 8, pp. 41,72, 227). He possessed past relevant work experience as a heavy equipment operator. (*Id*. at 41, 227-228, 238-241).

On December 19, 2023, Administrative Law Judge ("ALJ") Bill Jones determined that the Plaintiff met insured status requirements through December 31, 2024. (ECF No. 8, p. 27). He then identified degenerative disk disease of the thoracic and lumber spine as severe impairments but concluded the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*. at 29-31). Despite Plaintiff's impairments, ALJ Jones found he retained the residual functional capacity ("RFC") to perform light work involving only occasional stooping and climbing. (*Id*. at 32). With the assistance of a vocational expert ("VE"), he determined Plaintiff could perform work as a merchandise marker, housekeeping cleaner, and power screwdriver operator. (*Id*. at 42).

The Appeals Council denied Plaintiff's request for review on September 26, 2024. (ECF No. 8, pp. 6-12). Plaintiff subsequently filed this action on November 20, 2024. (ECF No. 2). Both parties have filed appeal briefs (ECF Nos. 12, 14), and the matter is ready for Report and Recommendation.

## II.     Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support

it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record to support the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § 404.1520(a)(4). The fact finder only

3

considers Plaintiff's age, education, and work experience in the light of his RFC if the final stage of the analysis is reached. 20 C.F.R. § 404.1520(a)(4)(v).

### III. Discussion

Plaintiff raises four issues on appeal: (1) whether the ALJ fully and fairly developed the record; (2) whether the Plaintiff's mental impairments were severe; (3) whether the ALJ properly considered the Plaintiff's subjective complaints; and (4) whether substantial evidence supports the ALJ's RFC determination. Of particular concern to the undersigned is the ALJ's RFC determination.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545. Although the RFC must be supported by some medical evidence that addresses the claimant's ability to function in the workplace, it is an administrative determination left to the ALJ. *Montgomery v. O'Malley*, 122 F.4th 1059, 1064 (8th Cir. 2024) (holding RFC is ultimately an administrative determination reserved to the SSA) (citations omitted); *see also Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (holding RFC must be supported by some medical evidence). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations," including symptoms such as pain. *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009).

Plaintiff injured his back on the job in January 2020. An exam revealed pain with extension and flexion of the spine, mild spasm, and positive bilateral straight leg raise tests. (ECF No. 8, pp. 314-319, 588-590). X-rays also showed mild straightening possibly caused by muscle spasms. An occupational specialist, Dr. Ian Cheyne, diagnosed muscle strain in the lower back and prescribed a Medro Dosepak, home exercises, and hot showers twice daily. An MRI conducted in

4

February 2020 showed a probable small left lateral disk protrusion at the L3-4 level with possible slight contact with the exiting left L3 nerve root but no nerve root compression or foraminal stenosis and disk degeneration and disk space narrowing from the T11-L2 levels. (ECF No. 8, pp. 330, 586-588). Dr. Cheyne restricted him to lifting 20 pounds occasionally, 10 pounds repetitively; limited his bending, stooping, and twisting; and indicated he should alternate sitting/standing/walking as tolerated. (*Id*. at 314-319, 588-590).

On follow-up with Dr. Cheyne in late February, Plaintiff indicated that his pain had slightly improved, rating it as a 5 on a 10-point scale. (ECF No. 8, pp. 325-329). However, he also complained of aching and sharp pain in his lower thoracic region accompanied by numbness radiating down both legs. An examination documented tenderness along the lumbar spine, pain with extension and flexion, and positive bilateral straight leg raise tests. Dr. Cheyne continued the work restrictions, prescribed muscle relaxants and anti-inflammatories and referred him to physical therapy ("PT").

On March 12, 2020, the Plaintiff rated his pain as a 6/10, indicating that he was participating in PT but was not improving. (ECF No. 8, pp. 331-335). As such, Dr. Cheyne continued his work restrictions and ordered a functional capacity evaluation ("FCE"). The following month, he referred Plaintiff to pain management for two lumbar epidural steroid injections ("LESI") and prescribed Gabapentin to treat his unexplainable right-sided sciatica. (*Id*. at 554-556). Plaintiff received the LESI injections on April 3 and April 17, and he participated in PT from February 26 until April 20, 2020. (*Id*. at 340-343, 350-438, 517-520, 527-580). His pain levels ranged from a 4 to an 8 with no significant improvement noted post treatment. On April 30, 2020, the Plaintiff was discharged with continued severe pain because advancing exercise activity further would overexert his current limits. (*Id*. at 350-353, 527-529).

On May 5, 2020, Plaintiff underwent an FCE. (ECF No. 8, pp. 741-759). Overall, he demonstrated the ability to perform work at the sedentary level; however, occupational and physical therapist, Richard Garrettson, indicated that the overall results did not represent a true and accurate representation of the Plaintiff's overall physical capabilities because he put forth unreliable effort and reported pain that did not correlate with his movement patterns.

Noting no response to the conservative treatment prescribed and the results of the FCE, Dr. Cheyne determined Plaintiff had reached maximal medical improvement and would be released to return to work without restriction with no permanent impairment of the body on May 8, 2020. (ECF No. 8, pp. 525-527).

Plaintiff established care with Dr. Mark Miller on May 12, 2020. (ECF No. 8, pp. 621-623). He admitted that he did not pass the FCE but insisted he was unable to currently perform his job. Plaintiff requested a neurology referral. Dr. Miller documented normal reflexes in both ankles and knees, normal strength in his lower extremities, and that Plaintiff could heel and toe walk as well as squat. However, Plaintiff's flexion was restricted to within 18 inches of the floor due to pain and he exhibited tenderness to palpation at the L3 level at the midline and inferior aspects. Dr. Miller prescribed Celebrex and Gabapentin.

Neurologist, Dr. Alejandro Castellvi, evaluated the Plaintiff in June 2020. (ECF No. 8, pp. 465-469, 473-474, 510-516, 806). He complained of continued thoracic and lower back pain radiating into his lower extremities but denied any weakness. Plaintiff rated his pain as a 6/10, reporting it was constant and responded to nothing. Dr. Castellvi noted steroid injections, Gabapentin, and Celebrex had not been effective in combating his pain. On examination, the Plaintiff was in no acute distress, alert and fully oriented, and exhibited appropriate memory, concentration, a normal range of motion in his neck, full motor strength in all his extremities, no

sensory deficits, a narrow-based gait with normal stride length, no antalgia, and a normal tandem walk. X-rays also showed mild spondylosis at the L3-L4 levels with moderate arthritic change involving the apophyseal joints of the lower lumbar spine. Accordingly, Dr. Castellvi ordered an electromyography ("EMG") of his lower extremities and an MRI of his thoracic spine.

One week later, Plaintiff advised Dr. Miller that he had noted no difference in his pain level since beginning Celebrex and Gabapentin. (ECF No. 8, pp. 624-625). At that time, he rated his pain as an 8/10, indicating he had been experiencing sharp pain around the belt line on the left size, pain from the buttocks down to the toes, and tingling and burning in the bottom of his feet. Dr. Miller increased his Gabapentin and Celebrex dosages. An MRI of his thoracic spine ultimately showed disc desiccation at each level of the thoracic spine with reduction of vertical disk height and abnormal marrow replacement signal and minimal disc bulge at the T10-T11 levels. (ECF No. 8, pp. 470-472).

When he returned to Dr. Castellvi on June 24, 2020, the Plaintiff complained of mid-back pain. (ECF No. 8, pp. 461-465, 501-509). His exam was positive for bilateral lower extremity weakness, but he exhibited a normal gait. Dr. Castellvi reviewed Plaintiff's MRI and concluded he suffered from DDD at multiple levels within the thoracic spine with no high-grade stenosis or compression and no foraminal or central stenosis in the lumbar. Accordingly, he concluded no surgical intervention was necessary and recommended Plaintiff continue conservative treatment.

In a letter to Dr. Miller dated June 30, 2020, Plaintiff advised that his pain had not decreased, and he remained unable to stoop, bend, lift, twist, or drive over 30 minutes without having to get out and walk. (ECF No. 8, p. 666). He rated his pain between a 6 and a 10, despite the recent increase in medication. Further, Plaintiff indicated he would not be able to return to work because his job required him to operate heavy equipment, lift heavy items, twist, and bend

to clear the right-of-way for the electric company. If he were to return to work, he insisted he could not perform the work and would ultimately be terminated.

On July 2, 2020, an EMG revealed normal bilateral peroneal and tibial motor studies, bilateral sural and superficial peroneal sensory responses, and symmetric reflex latencies. (ECF No. 8, pp. 763-768). Five days later, Dr. Miller examined the Plaintiff and completed a certification for leave under the Family and Medical Leave Act ("FMLA"). (ECF No. 8, pp. 627-629, 667-670, 804-805). Noting Plaintiff's nonresponse to the Gabapentin and Meloxicam, he discontinued those medications in favor of Lyrica and referred him to pain management. On Plaintiff's FMLA paperwork, Dr. Miller indicated he was unable to perform job functions such as operating heavy equipment and chainsaws, bending, lifting, twisting, and stooping due to chronic bilateral low back pain radiating bilaterally down into his toes. Further, Dr. Miller indicated Plaintiff's incapacity began February 2, 2020, and would continue through November 3, 2020. He also indicated Plaintiff was continuously incapacitated due to pain and weakness in his legs.

Dr. Castellvi reviewed Plaintiff's EMG results on July 15, 2020, and again recommended conservative treatment with PT and ESIs. (ECF No. 8, pp. 456-460, 493-500). An exam revealed full motor strength in both lower extremities, no sensory deficits, a narrow-based gait with normal stride length, no antalgia, and a tandem gait within normal limits.

A pain specialist, Dr. Jason Holt, evaluated the Plaintiff on August 12, 2020, prescribing a trial of Baclofen and Cymbalta and weaning him off Lyrica. (ECF No. 8, pp. 594-597). He noted moderate to severe pain, a stiff gait, tender trigger points in the bilateral erector spinae, moderately restricted flexion, and dermatomal patterned tenderness at the L4-S1 levels. Dr. Holt indicated he would defer to the FCE for recommendations regarding Plaintiff's work abilities and limitations. The following month, Plaintiff indicated that with Cymbalta, his pain remained at a 6 to a 7 out of

10. (*Id*. at 490-492, 598). He was also taking Baclofen as needed. With an unchanged physical exam, Dr. Holt restarted the Lyrica and referred Plaintiff back to Dr. Miller to test for Lyme, mercury poisoning, thyroid disorder, and tick fever. Two days later, Dr. Miller ordered the appropriate tests. (ECF No. 8, pp. 633-636).

On September 29, 2020, Dr. Jaclyn Hastings, Dr. Miller's associate, conducted a disability exam. (ECF No. 8, pp. 630-632). She documented an antalgic, unsteady gait; tenderness along the lumbar muscles and into his left sacroiliac joints, and difficulty arising from a seated position (took 10 seconds). Dr. Hastings completed an attending physician's statement of disability for long-term disability benefits indicating Plaintiff suffered from lumbago with bilateral sciatica radiating down into his toes. (*Id*. at 770-771). She indicated that despite taking Cymbalta and Lyrica, having received two rounds of ESIs, and participating in PT, Plaintiff's pain never decreased below a 6/10. It was her opinion that he could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; sit for 30 minutes; stand for 15 minutes; walk for 15 minutes and would need to change positions frequently. Although Plaintiff could use both feet for repetitive movements, Dr. Hastings stated he would need to take frequent breaks. Further, he could not bend/stoop, kneel, crouch, reach above shoulder level, or crawl. Dr. Hastings recommended vocational counseling and/or retraining if he was interested.

The following month, Plaintiff returned to Dr. Holt. (ECF No. 8, pp. 601-602). Plaintiff reported continued leg and back pain rendering him unable to drive longer than 15 minutes. He also voiced a concern that his medication might be affecting his sexual function. An exam revealed tender trigger points in the erector spinae, moderately restricted flexion, and dermatomal pattern tenderness at the L4-S1 levels. After noting Plaintiff's MRI results, substantially normal workups, and significant pain in his lower back and lower extremities, Dr. Holt diagnosed lumbar

spondylosis, myalgia, and lower back pain. He recommended a potential referral to the Mayo Clinic, stating a caudal injection (injection of steroids, anesthetics, and opioids) should be explored.

In January 2021, interventional pain specialist, Dr. Jared Ennis, evaluated Plaintiff for complaints of pelvic, back, hip, buttock, thigh, knee, leg, and ankle pain. (ECF No. 8, pp. 604-605). After missing two doses of Cymbalta, the Plaintiff experienced suicidal ideations and severe anxiety. As such, he wanted to wean off the Cymbalta. The Mayo Clinic had denied his referral because his back injury had resulted from an on-the-job injury. Although he agreed that a caudal injection was an option, Dr. Ennis wished to defer at this time. Without making any changes to Plaintiff's medications, he directed him to return in three months for an exam to determine the specific location of his pain. When he returned in May, Dr. Ennis noted he had received a request from Plaintiff's dentist to stop the Cymbalta due to bruxism. (ECF No. 8, pp. 608-609). The doctor agreed to wean him off the Cymbalta and revisited the option of a caudal injection. Because the initial LESIs were ineffective, however, Plaintiff was hesitant to move forward. Therefore, Dr. Ennis referred him back to Dr. Miller to discuss pain medications.

On May 18, 2021, Plaintiff complained of restless leg syndrome with an inability to get comfortable at night and constant burning in the bottom of his feet. He indicated that the Lyrica was not effective. Accordingly, Dr. Miller prescribed Nortriptyline, advised him to begin tapering down the Cymbalta, and referred him to sleep specialist, Dr. Madhu Kalyan. Because Plaintiff did not experience bruxism while taking 30 mg of Cymbalta, Dr. Miller opined he could continue at that dose.

In June, Dr. Miller noted a reduced range of motion in his back and tenderness to palpation at the L2 level and below. (ECF No. 8, pp. 643-645). Noting the Lyrica to be ineffective, he

prescribed Tramadol and recommended the Plaintiff purchase a Lifepro Waver Vibration Plate (an oscillating fitness device that uses vibration to help tone muscles, boost circulation, improve balance, and speed up recovery) and consider chiropractic care. The following month, a depression screen revealed moderate depression. (ECF No. 8, pp. 646-649). And an exam revealed right upper quadrant epigastric tenderness, poor knee and ankle jerks with a limited range of motion, and no acute distress. Dr. Miller continued the Tramadol, Cymbalta, Nortriptyline, and Colestipol (for irritable bowel syndrome). Unfortunately, in August, Plaintiff rated his pain as 7/10, and Dr. Miller recommended he take Glucosamine and Chondroitin.

Plaintiff's pain persisted, as did the depression resulting from his incapacitation. (ECF No. 8, pp. 654-656). In mid-October, Dr. Miller prescribed Duloxetine and refilled the Tramadol. And, in early November, the Plaintiff complained of right shoulder pain radiating into his fingers. (ECF No. 8, pp. 657-659). An exam revealed tenderness over the right acromioclavicular joint and trapezius. Dr. Miller prescribed Celebrex.

On November 23, 2021, Plaintiff advised Dr. Hastings that his pain remained at a 6/10. (ECF No. 8, pp. 660-662). The previous week he felt a pop in his back when bent over to tie a trash bag. Dr. Hastings noted tenderness along the sciatic notch and right buttock. Accordingly, he increased Plaintiff's Celebrex and Tramadol and continued the Duloxetine and Nortriptyline unchanged.

In December, Plaintiff's pain had increased to an 8 or 9 out of 10. (ECF No. 8, pp. 663-665). He reported difficulty walking, standing, lying down, and bending. Further, his physical exam was positive for tenderness in the paraspinal muscles bilaterally and a positive straight leg raise test while sitting. Dr. Miller prescribed Tizanidine, a trial of Zanaflex, and chiropractic care and refilled his Tramadol and Lyrica.

Plaintiff began treatment with chiropractor, Dr. Phillip Ulmschneider at Ozark Chiropractic Clinic on December 20, 2021. (ECF No. 8, pp. 681). Palpation of the muscles revealed a moderate degree of hypertonicity bilaterally in the rhomboideus major and minor, lower trapezius and latissimus dorsi, multifidus and sacrospinalis, and gluteus maximus, as well as some increased muscle tension in the bilateral rectus, obliquus, semispinalis, upper trapezius, middle trapezius, supraspinatus, and rhomboideus major and minor. Plaintiff exhibited a moderate degree of pain at the C4-C6, T5-T6, T11- L5 levels and the ilia bilaterally as well as mild pain at the Cl-C2 level bilaterally. Further, he exhibited a decreased range of motion in his cervical and lumbar spine. Dr. Ulmschneider opined that his overall prognosis was guarded due to his history of multiple episodes, neurological complications, and pre-existing degeneration and may be complicated by his pre-existing injuries and spinal degeneration. Additionally, x-rays revealed mild to moderate osteoarthritis at the C5-C6, and T8-L4 levels; mild to moderate DDD at the C5-C6 and L1-L5 levels; mild to moderate hyperlordosis at the L1-L4 level; mild to moderate lordosis on the anterior at the C2-C7 levels; and vertebral malposition at the C2, C5, C6, T2, T5, T6, T11, T12, L4, and bilateral ilium. (*Id*. at pp. 682-684). Plaintiff received chiropractic treatment through March 2022, reporting only modest improvement in his pain. (*Id*. at pp. 684-710).

On April 1, 2022, Plaintiff presented in Dr. Miller's office for a general wellness exam. (ECF No. 8, pp. 800-803). A depression screen revealed severe depression, and the Plaintiff reported sleeping a lot. Noting generalized bilateral lower leg edema, Dr. Miller prescribed Lidoderm, refilled the Tramadol and Lyrica, and advised him to do whatever physical activity he could do. When lab tests revealed abnormal lipid levels, Dr. Miller prescribed Atorvastatin. (*Id*. at pp. 797-799).

Between April 11 and July 25, 2022, Plaintiff attended 10 appointments with Dr. Ulmschneider. (ECF No. 8, pp. 680, 710-711, 794-496, 813-822). He reported some improvement in his upper back, lumbar, bilateral shoulder, and neck pain, right sciatica, and headache pain.

During a consultative exam with Dr. Rayetta Eaton on August 6, 2022, Plaintiff complained of back, leg, and memory problems. (ECF No. 8, pp. 714-720). On exam, he was alert and fully oriented with no observable psychosis or symptoms of mood disorder; pain in the paraspinous muscles; pain with straight leg raise to 20 degrees; and difficulty squatting and arising from a squatting position. However, he exhibited a normal range of motion in all areas tested and could hold a pen and write, touch fingertips to palm, oppose thumb to fingers, and pick up a coin. Further, his gait and station were within normal limits. X-rays of his lumbar spine showed no compression or deformity of the lumbar spine with normal SI joints. Dr. Eaton reviewed Plaintiff's MRI and EMG results and diagnosed back pain. She opined that the Plaintiff had no limitations sitting and standing, could walk occasionally, and could lift and carry five pounds continuously.

The following month, Dr. Miller refilled Plaintiff's Tramadol, Celecoxib, Tizanidine, Pregablin, Nortriptyline, Atorvastatin, Duloxetine, and Omeprazole. (ECF No. 8, pp. 791-793). By December, his depression was moderate, and he was doing well on his medications. (*Id*. at pp. 788-790). Dr. Miller refilled his medications and prescribed Wellbutrin. Plaintiff also continued chiropractic care with Dr. Ulmschneider, reporting a slight worsening of his midline lower back, shoulder, and right sciatic pain with continued modest improvement in his neck and ankle pain. (*Id*. at pp. 825-833).

In January 2023, Plaintiff rated his pain as a 7/10, indicating that the Wellbutrin had been helpful. (ECF No. 8, pp. 786-787). Dr. Miller increased the dose. Follow-up visits with Dr. Ulmschneider also documented mild to moderate pain in the right side of the lower back, right

13

sciatica, left shoulder, midline of the neck, and right sacroiliac area with only slight improvement noted. (ECF No. 8, pp. 833-836).

Plaintiff returned to Dr. Miller on March 6, 2023, with only mild depression. (ECF No. 8, pp. 783-785). He indicated that his symptoms had improved, rating his pain as a 6/10. (*Id*. at pp. 836-838). Dr. Miller again increased his Wellbutrin dosage and prescribed Lavela WS-1265, an oral lavender essential oil that helps promote relaxation and foster sleep quality. (*Id*. at pp. 783-785).

In April, Plaintiff advised Dr. Miller that the Tramadol kept his pain "fairly level," and he was tolerating his medications well. (ECF No. 8, pp. 781-782). Bad weather, sitting, riding, and standing on hard surfaces aggravated his pain. Dr. Miller referred Plaintiff for counseling and continued his medications without change. Further, during chiropractic appointments, he rated his pain as a 6 to a 7 out of 10. (ECF No. 8, pp. 838-840). Said ratings persisted through May 2023. (*Id*. at pp. 840-843).

Five days later, during a wellness exam, Dr. Miller documented right upper quadrant abdominal tenderness with distension, a markedly limited range of motion in his back, and an inability to squat. (ECF No. 8, pp. 776-780). In June, Plaintiff's sciatic pain had reduced to a 3/10 but his sciatica remained a 5/10. (ECF No. 8, pp. 844-845). The following month, Dr. Johnson noted he was unable to sit comfortably during the session, turning periodically to get relief. (*Id*. at p. 847).

In February 2024, Plaintiff returned to Dr. Miller with complaints of continued back pain. (ECF No. 8, pp. 14-16). An exam revealed hypersensitivity in his right ankle but was otherwise normal. Due to chronic pain, Dr. Miller opined that the Plaintiff was unable to perform the daily functions that any job would require, cannot lift more than 10 pounds without risk of further injury,

14

and should be considered for permanent disability. Further, the doctor noted that his pain limited his ability to focus on tasks.

Despite this evidence, the ALJ chose to adopt the assessments of agency physicians who reviewed the record in August 2022 and March 2023 and concluded the Plaintiff could perform light work with occasional stooping and crouching. (EFC No. 8, pp. 77-78, 85-87). As previously noted, however, several physicians have expressed concern that the Plaintiff's ability to sit, walk, bend, and twist was more restricted than assessed by the ALJ. In fact, the evidence suggests the Plaintiff would need to alternate between sitting, standing, and walking. There is also disagreement as to the amount of weight the Plaintiff can lift/carry, with the Plaintiff himself indicating he could carry no more than 10 pounds, and Dr. Miller opining that lifting more than 10 pounds could result in further injury. (*Id*. at pp. 14-16, 241-248). Contrary to the ALJ's contention, these restrictions are supported by x-rays and MRIs showing disk bulging, degeneration, and dessication, as well as reduced disk height, hyperlordosis, and flexion subluxation. Accordingly, we cannot say that substantial evidence supports the ALJ's conclusion that the Plaintiff can perform light work with only stooping and climbing restrictions. Therefore, it is necessary to remand this case to allow the ALJ to further consider the Plaintiff's RFC.

### IV.   Conclusion

Based on the foregoing, it is RECOMMENDED that the Commissioner's decision be reversed, and the case remanded back to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties**

**that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 21st day of January 2026.

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE